**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

IN RE:  **John Walter Pajot**                     Case No. 06-31446-DOT
        **Amy Lillian Taylor**                  Case No. 06-31861-DOT
        **Rebecca Ann Price**                 Case No. 06-31734-DOT
        **Morris Dwayne Horne**          Case No. 06-33159-DOT

      Chapter 13 Debtors

## OPINION

Hearings were held on November 8, 2006, January 10, 2007, and April 17, 2007, on

objections to confirmation filed by secured creditors in each of these four cases filed under

chapter 13 of the Bankruptcy Code.  Four different creditors object to confirmation of the

debtors' proposed chapter 13 plans because the plans attempt to bifurcate the relevant secured

creditor's claim into an unsecured and a secured portion.  The debtors are all represented by the

same counsel. The collateral at issue in each case is a motor vehicle, purchased for the debtor's

personal use within the 910 days preceding each debtor's bankruptcy filing.  As part of acquiring

the collateral in each of the cases, the debtor traded in a vehicle which was subject to debt

exceeding its trade-in value.  The excess debt less the vehicle's trade-in value, known as the

"negative equity," was rolled into the financing package for the purchase of the new vehicle.

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA)[1],

applies because each of these cases was filed after October 15, 2005.  As part of the large-scale

revision of the Bankruptcy Code, Congress added a provision preventing bifurcation of

purchase-money security interests in motor vehicles purchased for personal use within the 910

days preceding a bankruptcy filing.  This provision was placed in 11 U.S.C. § 1325(a) in an un-

numbered, "hanging" paragraph following § 1325(a)(9).[2]  The creditors' objections to

confirmation argue that each debtor has improperly attempted to bifurcate the creditors' claims,

in contravention to this new provision.  The debtors argue that a claim including rolled-in

negative equity is not entirely a purchase-money security interest.  Hence, the hanging paragraph

is inapplicable, and the claim can be bifurcated.

Hearings were held in all the cases, and the court has taken each under advisement.  The

facts in each of the cases are essentially the same; therefore, this court will address all four cases

together in this consolidated opinion and issue separate orders for entry in each of the cases.  The

court finds that the portion of the claim corresponding to rolled-in negative equity may be

bifurcated because it is not a purchase-money security interest, but the hanging paragraph applies

to the remaining purchase-money portion, which cannot be bifurcated as proposed by debtors'

plans.  For the reasons set forth below, the objections to confirmation will be sustained in part

with the plan provisions to be modified as discussed herein.

<u>Findings of Fact</u>

<u>John Walter Pajot</u>                    Case No. 06-31446-DOT

On June 15, 2006, debtor John Walter Pajot filed a voluntary petition for relief under

chapter 13.  Debtor had purchased for his personal use a 2005 Mazda Tribute from Capitol

Lincoln Mercury on April 28, 2005, less than 910 days prior to filing.  Branch Banking & Trust

Company ("BB&T") financed the purchase for a total of $24,871.16 and retained a purchase-

money security interest in the vehicle pursuant to a lien recorded on the Certificate of Title filed

---

[1] Pub. L. 109-8, April 20, 2005, 119 Stat. 23.
[2] This paragraph has been variously referred to as § 1325(a)(9), 1325(a)(*), and the "hanging paragraph."  For the remainder of this opinion, the court will use "hanging paragraph" in text and 1325(a)(*) for citations.

with the Virginia Department of Motor Vehicles.  As part of the financing transaction, debtor

traded in a 2003 Mazda Protégé to Capitol.

At the time of the trade-in, the Protégé was subject to a note held by another creditor,

Onyx, with a payoff in the amount of $14,960.82.  Capitol allowed a trade-in amount of $7,000

for the Protégé, which resulted in a deficiency of $7,960.82 in the amount owed to Onyx.  This

negative equity amount was included in the total amount financed by BB&T for the purchase of

the Tribute and increased the total financing package to $24,871.16, after applying a rebate of

$3,000.00 to the transaction.

Debtor's chapter 13 plan, filed on June 20, 2006, proposed a separation of the debt to

BB&T, which would receive a secured claim in the amount of $13,125.18 and a general

unsecured claim in the amount of $7,960.82, totaling $21,086.00.  BB&T had filed a secured

claim in the amount of $21,137.60.[3]

BB&T objected to confirmation of the plan on June 21, 2006, alleging that the plan does

not provide for BB&T's secured claim in full pursuant to 11 U.S.C. § 1325(a)(5).


Amy Lillian Taylor                        Case No. 06-31861-DOT

Debtor Amy Lillian Taylor filed a voluntary petition for relief under chapter 13 on July

25, 2006.  Within 910 days prior to filing, debtor had purchased for her personal use a 2005

Mazda 6 on March 31, 2006, from Whitten Brothers, Inc.  CitiFinancial financed the vehicle

purchase in the amount of $20,146.18 and retained a purchase-money security interest in the

---

[3] The difference between the total claim debtor proposes to repay in the plan and the proof of claim is not the grounds for the objection.  The debtor did not object to the claim amount as filed by the creditor, so the claim is allowed in that amount instead of the amount the debtor listed in the plan. The creditor's objection is based on the reclassification of the $7,960.82 as unsecured debt. The plan provides for payment in full on secured claims, but the creditor would receive less than a 100% payout on any unsecured portion of the claim.

vehicle.  As part of the financing, debtor traded in a 2002 Mazda 626.  At the time of the trade-in, debtor owed $10,721.88 and Whitten Brothers valued the trade-in at $6,800.00, leaving $3,921.88 of negative equity financing that was rolled over into the financing for the Mazda 6.

On July 27, 2006, debtor filed a chapter 13 plan, valuing CitiFinancial's total claim as $20,122.00 and proposing to separate CitiFinancial's claim into a secured portion in the amount of $16,201.00 and an unsecured portion in the amount of $3,921.00.  CitiFinancial filed a proof of claim on July 31, 2006 claiming $20,732.53[4]  as the total amount owed, which included the negative equity rolled into the financing transaction as secured debt.

On August 11, 2006, CitiFinancial objected to confirmation of the plan, claiming that the plan failed to satisfy the provisions of 11 U.S.C. § 1325(a)(5).

Rebecca Ann Price                    Case No. 06-31734-DOT

Debtor Rebecca Ann Price filed a voluntary petition for relief under chapter 13 on July 14, 2006.  She had purchased for her personal use a 2005 Nissan Xterra from Dominion Nissan on December 16, 2005, within the 910 days preceding filing.  Nissan Motor Acceptance Corporation ("Nissan") financed the transaction through a Virginia Simple Interest Retail Installment Contract.  The contract indicates that the cash price of the Xterra was $27,944.00 and the total amount of financing was $34,153.74.  The $6,209.74 difference between the two figures included charges of $995.00 for a service contract, $295.00 for gap insurance, $95.00 for a document preparation fee, $908.44 for sales tax, $27.00 for license, registration and title fees, and $8,229.30 to pay off the obligation owed on the trade-in vehicle owed to the creditor, Branch Banking & Trust ("BB&T"), reduced by credits of $2,000.00 for a manufacturer's rebate, a

$200.00 cash payment and $2,140.00 for a trade-in allowance.  The negative equity rolled into the transaction therefore is the $8,229.30 payoff less the $2,140.00 trade-in allowance, yielding $6,089.30.

On July 24, 2006, Nissan filed a proof of secured claim for its security interest in the vehicle in the amount of $32,745.48[5].  Debtor filed her chapter 13 plan on July 26, 2006, which proposed to separate Nissan's claim into a secured portion in the amount of $21,625.00 and an unsecured portion in the amount of the negative equity paid off by the financing transaction without accounting for the trade-in allowance, $8,229.30.[6]

Nissan objected to confirmation on August 24, 2006 on the grounds that the plan does not comply with the provisions set forth in 11 U.S.C. § 1325(a)(5) and requested that the plan's confirmation be denied.


Morris Dwayne Horne                  Case No. 06-33159-DOT

Debtor Morris Dwayne Horne filed a voluntary petition for bankruptcy under chapter 13 on November 7, 2006.  Prior to filing, on June 24, 2006, debtor had purchased for his personal use a 2006 Chevrolet HHR from Dominion Chevrolet Cadillac.  Debtor traded in a 2004 Chevrolet Colorado truck as part of the financing of the HHR.  Because debtor owed $3,721.17 more on the Colorado than the amount it was worth, debtor requested that this negative equity be rolled into the financing for the HHR.  Along with the negative equity, the financing included the

---

[4] The debtor did not object to the creditor's proof of claim, and it is deemed allowed in that amount.  See supra note 3.

[5] The debtor did not object to the creditor's proof of claim, and it is deemed allowed in that amount.  See supra note 3.

[6] In the other consolidated cases, the negative equity amount cited by debtors was reduced by the trade-in allowance they were given on the vehicle.  For example, in Pajot the payoff to the prior creditor was $14,960.82, with a trade-in allowance of $7,000.00, leaving the negative equity at $7,960.82.  Ms. Price's plan did not credit the trade-in

cash price of the vehicle, a $755.00 service contract, gap insurance of $195.00[7], and other fees. The total amount the dealer financed was $22,328.91, which sum is secured by a security interest in the vehicle.  Subsequently, the dealer assigned the financing contract to GMAC.

On November 9, 2006, debtor filed his chapter 13 plan which proposed to separate GMAC's claim into a secured portion totaling $15,535.00 and an unsecured portion totaling $6,000.00.  Debtor had listed the vehicle on his bankruptcy schedules as having a value of $16,600.00.

GMAC filed a proof of claim in the amount of $21,332.71[8] on December 28, 2006 and objected to the confirmation of the plan on the grounds that the plan violated the provisions of 11 U.S.C. § 1325(a)(*) by bifurcating its claim.

<u>Discussion and Conclusions of Law</u>

Prior to the enactment of BAPCPA, a debtor's chapter 13 plan could bifurcate a secured creditor's claim into a secured portion equal to the value of the collateral at filing and an unsecured portion for the remainder.  11 U.S.C. § 506.  This was often referred to as "cramdown" because the secured creditor could not object to such treatment.[9]  In BAPCPA, Congress added a "hanging paragraph" after 11 U.S.C. § 1325(a)(9), which carves out conditions that exempt a creditor's claim from cramdown and bifurcation under § 506.  The hanging paragraph states:

---

allowance the same way so the court has reduced the payoff by the trade-in allowance to calculate the negative equity rolled into the transaction, $6,089.30.

[7] The gap insurance fee according to the purchase contract stipulated to by debtor and GMAC is $195.00 rather than the $495.00 stated in debtor's brief. <u>See</u> Horne Response, Case No. 06-33159, Docket # 33, p. 14.

[8] The debtor did not object to the creditor's proof of claim, and it is deemed allowed in that amount.  See supra note 3.

[9] In a chapter 13 plan, secured claims must generally be paid in full, whereas unsecured claims must merely be paid an amount in excess of what would be recovered in a chapter 7 liquidation. 11 U.S.C. § 1325(a)(4), (5). As a result, unsecured claims often receive payments of mere pennies on the dollar.  Bifurcation of a claim in this manner

> For purposes of paragraph (5), section 506 shall not apply to a claim described in
> that paragraph if that creditor has a purchase money security interest securing the
> debt that is the subject of the claim, the debt was incurred within the 910–day
> [sic] preceding the date of the filing of the petition, and the collateral for that debt
> consists of a motor vehicle (as defined in section 30102 of title 49) acquired for
> the personal use of the debtor, or if collateral for that debt consists of any other
> thing of value, if the debt was incurred during the 1–year period preceding that
> filing.

11 U.S.C. § 1325(a)(*). This means that when a debtor purchases a motor vehicle for his

personal use within 910 days of filing a bankruptcy petition and the creditor holds a purchase-

money security interest in that motor vehicle, the debtor may not cram down the value under §

506.

It is undisputed in each of these cases that the motor vehicles were purchased for personal

use within 910 days of the bankruptcy filing. Therefore, the only remaining issue is whether the

creditor has a purchase-money security interest in the collateral. More specifically, the issue is

whether the negative equity from a previous motor vehicle financing transaction that is rolled

into a second motor vehicle financing transaction where the lender retains a purchase-money

security interest is included in the definition of purchase-money security interest under Virginia

law.[10]

---

therefore provides the creditor 100% recovery on the secured portion of its claim but likely far less than 100% on
the unsecured portion.

[10] In its brief, GMAC argues that Congress intended the hanging paragraph to be applied broadly to all components
of vehicle financing transactions, and that the distinctions between 11 U.S.C. § 1322(b) and the hanging paragraph
1325(a)(*) make it clear that congress intended the hanging paragraph to protect negative equity. Section 1322(b)
grants protection for residential mortgage lenders, preventing bifurcation for claims "secured *only* by a security
interest in real property that is the debtor's principal residence…" 11 U.S.C. § 1322(b) (emphasis added). GMAC
argues that because the text of the hanging paragraph does not protect *only* the cash price of a motor vehicle,
Congress intended to incorporate all portions of a motor vehicle financing transaction and protect them from
bifurcation. This argument is not compelling. The creditor essentially asks this court to read the "purchase-money
security interest" requirement out of the statute. This limiting requirement serves the same purpose as the "only by a
security interest in real property" limitation in section 1322(b), by specifying which types of security interests are
protected from bifurcation. Further, the "purchase-money" language was absent from earlier drafts of BAPCPA, see
William C. Whitford, A History of the Automobile Lender Provisions of BAPCPA, 2007 U. Ill. L. R. 143, 177 –
183 (2007), hence this court believes its addition to be intentional and meaningful. To determine what is covered by
the hanging paragraph, this court will analyze the components of purchase-money security interests under state law.

In order to address the effect of the hanging paragraph, the court must first determine the extent to which the relevant creditor's security interest is a purchase-money security interest. Purchase-money security interest is a term undefined in the bankruptcy code. Therefore "[w]hether a creditor has a purchase-money security interest securing a debt is a matter of state law." In re Vega, 344 B.R. 612, 622 (Bankr. D. Kan. 2006). In Revised Article 9 of the Uniform Commercial Code (U.C.C.), enacted in Virginia as Va. Code Ann. § 8.9A, purchase-money security interests are a separately defined class of security interests that are treated differently from other security interests in some circumstances. See Va. Code Ann. § 8.9A-103.

The scope of the definition of purchase-money security interest is critical in this case. If the secured creditor does not hold a purchase-money security interest at all, then it is clear that the hanging paragraph does not apply to its claim, and it may be bifurcated under § 506. Likewise if the creditor holds a purchase-money security interest in the value of the entire claim, then the hanging paragraph will apply, and the entire claim will be considered secured and not subject to bifurcation. If the purchase-money security interest extends only partially, however, the court must then determine the effect of the non-purchase-money portion on the purchase-money status of the entire transaction. In the partial purchase-money situation, state law gives the court discretion in consumer cases to determine whether to characterize the entire transaction as non-purchase-money (the "transformation rule"), or to treat it as only partially purchase-money (the "dual status rule"). Va. Code Ann. § 8.9A-103(h). Therefore, this opinion addresses two questions in turn: 1) whether the negative equity portion is a purchase-money security interest, and 2) if it is not, whether to apply the dual status or the transformation rule to determine the treatment of the transaction as a whole.

For the below reasons, the court holds that the portion of the transaction corresponding to negative equity is not considered a purchase-money security interest under Virginia law. Because the purchase-money security interest does not encompass the entire financing transaction, the court finds the dual status rule compelling and applicable to the facts presented by the parties. Therefore, the portion of each creditor's claim relating to negative equity is a non-purchase-money security interest, and may be bifurcated into a secured and unsecured portion in accordance with 11 U.S.C. § 506. The remaining portion of the financing transaction, with the exception of gap insurance fees, retains its purchase-money status. Therefore, the hanging paragraph applies to the remainder, and it may not be bifurcated.

I.      *Whether negative equity constitutes a purchase-money security interest.*

A number of recently published cases, In re Graupner, 356 B.R. 907 (Bankr. M.D. Ga. 2006) *aff'd*, Case No. 4:07-CV-37 (M.D. Ga. June 26, 2007), In re Peaslee, 358 B.R. 545 (Bankr. W.D.N.Y. 2006)[11], In re Price, 363 B.R. 734 (Bankr. E.D.N.C. 2007)[12], In re Westfall, 2007 WL 981730 (Bankr. N.D. Ohio Mar. 30, 2007), In re Bray, 2007 WL 1095435 (Bankr. W.D. Tenn. Apr. 11, 2007), and In re Acaya, 2007 WL 1492475 (Bankr. N.D. Cal. May 18, 2007), interpret negative equity transactions and the effect of the hanging paragraph. Peaslee, Price, Westfall, Bray, and Acaya represent the majority published view[13] and are more persuasive in holding that

---

[11] Judge Ninfo has published a number of other opinions following his own In re Peaslee opinion. For the purposes of this opinion, this court will focus only on In re Peaslee. See, e.g. In re Jackson, 358 B.R. 560 (Bankr. W.D.N.Y. 2007); In re Grant, 359 B.R. 438 (Bankr.W.D.N.Y. 2007); In re Cassidy, 362 B.R. 596 (Bankr.W.D.N.Y. 2007); In re Martinez, 362 B.R. 600 (Bankr.W.D.N.Y. 2007); In re Colombai, 362 B.R. 605 (Bankr.W.D.N.Y. 2007); In re Freeman, 362 B.R. 608 (Bankr.W.D.N.Y. 2007); In re Phillips, 362 B.R. 612 (Bankr.W.D.N.Y. 2007); In re Rodwell, 362 B.R. 616 (Bankr.W.D.N.Y. 2007); In re Vanmanen, 362 B.R. 620 (Bankr.W.D.N.Y. 2007).

[12] For clarity's sake, all references to the consolidated cases dealt with in this opinion will not be underlined. Therefore, debtor Rebecca Ann Price's case consolidated in this opinion will be discussed as Price, whereas In re Price, 363 B.R. 734 (Bankr. E.D.N.C. 2007), will be cited as Price where applicable.

[13] The court has reviewed the recent written decision supporting the minority view in In re Petrocci, Case No. 06-34191 (Bankr. N.D.N.Y. June 20, 2007), which has not yet been published in an online database. The court is also aware of the oral rulings in In re Wible, Case No. 06-40017 (Bankr. M.D. Ga. June 26, 2006), and In re Honeycutt, Case No. 06-48771 (Bankr. E.D. Mich. Nov. 2, 2006), which support the minority view. This court does not find

the negative equity is not part of the purchase-money security interest.  The court agrees with the

majority view that the definition of purchase-money security interest does not encompass rolled-

in debt incurred to pay off negative equity.  Virginia's Uniform Commercial Code, Va. Code

Ann. § 8.9A, does not provide for the inclusion of negative equity in a purchase-money

obligation. Further, no other statutes in Virginia elaborate sufficiently on the definition of

purchase-money security interests to support the inclusion of negative equity.

The Bankruptcy Code does not define purchase-money security interest, as used in the

hanging paragraph, and state law determines what is included in the definition.  In re Vega, 344

B.R. 612, 622 (Bankr. D. Kan. 2006). See Pristas v. Landaus of Plymouth, Inc.,, 742 F.2d 797,

800 (3d Cir. 1984); In re Curtis, 345 B.R. 756, 763 (Bankr. D. Utah 2006).  The Virginia Code

defines purchase-money security interest as a security interest "*to the extent that* the goods are

purchase-money collateral with respect to that security interest."  Va. Code Ann. § 8.9A-

103(b)(1) (emphasis added).  This in turn relies on the definition of purchase-money collateral,

which is defined by the Virginia Code as "goods . . . that secure[] a purchase-money obligation

incurred with respect to that collateral."  Id. at § 103(a)(1).  A purchase-money obligation then is

"an obligation of an obligor incurred as all or part of the price of the collateral or for value given

to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."

Id. at § 103(a)(2).  The question in this case boils down to whether the portion of the debt

incurred to pay off the negative equity is "incurred as all or part of the *price* of the collateral," or

constitutes "*value given to enable* the debtor to acquire rights in or the use of the collateral if the

---

persuasive authority in an oral, unwritten decision by a bankruptcy court in another circuit.  Regardless, Honeycutt
is distinguishable because it involved a rolled-in lease deficiency held by the same creditor, rather than negative
equity from another creditor as is the situation in this case.  The court is not compelled by GMAC's characterization
of Honeycutt as a negative equity case when the charges rolled into the new transaction were for a lease deficiency.

value is in fact so used." <u>Id.</u> at § 103(a)(2) (emphasis added).  The court addresses each of these
in turn.

   A.  *Negative equity is not a component of the price of the collateral.*

   The minority position, put forth by the <u>Graupner</u> opinion in the Bankruptcy Court for the
Middle District of Georgia, holds that a purchase-money security interest includes negative
equity rolled into a new motor vehicle financing transaction.  <u>Graupner</u> relied on a finding that
the statute defining purchase-money security interest, Ga. Code Ann. § 11-9-103 (2000), was
ambiguous.  <u>In re Graupner</u>, 356 B.R. at 919.  This statute is identical to Virginia Code § 8.9A-
103 because both states have adopted Revised Article 9 of the Uniform Commercial Code.
Specifically, <u>Graupner</u> found that the term "price of the collateral" in Ga. Code Ann. § 11-9-
103(a)(2) was ambiguous, despite the fact that Georgia courts had previously found the
definition of purchase-money security interest "clear on its face." <u>In re Graupner</u>, 356 B.R. at
919.  Therefore, with an ambiguous statute the court sought to clarify the meaning of "price" to
determine if its definition encompassed negative equity.

   The court looked elsewhere in the Georgia Code to interpret the meaning of the term
"price of the collateral" and adopted the definition of "cash sales price" from the Motor Vehicle
Sales Finance Act ("MVSFA"), Ga. Code Ann. § 10-1-30 et seq., as the clarifying statute.  <u>In re
Graupner</u>, 356 B.R. at 921.  The MVSFA includes in the cash sales price "any amount paid to the
buyer or to a third party on behalf of the buyer to satisfy a lease on or a lien on or a security
interest in a motor vehicle used as a trade-in on the motor vehicle which is the subject of a retail
installment transaction." Ga. Code Ann. § 10-1-31(a)(1).  The court ruled that the creditor held a
purchase-money security interest in the debtor's truck in an amount that included the amount of
the negative equity from a trade-in car that was rolled into the financing.  The creditors here urge

11

this court to take the approach in <u>Graupner</u> and look to other Virginia statutes to broadly define the purchase price of the motor vehicle in question.

The majority position, represented by <u>Price</u> and <u>Peaslee</u>, found the term "price of the collateral" to be clear on its face in the context of the U.C.C.  This court agrees with the finding in <u>Peaslee</u>, that the term means nothing more than "the actual price of the collateral being acquired."  <u>In re Peaslee</u>, 358 B.R. at 556.  The creditors in this and previous cases urge the court to look to other statutes to offer a gloss on the definition of "price."  This court does not feel compelled to review these statutes because none of them were enacted with the purpose of defining a purchase-money obligation under the U.C.C.  <u>See id.</u>  This approach is further reinforced by the fact that the official comments to Virginia Code § 8.9A-103(a)(2) offer the enacting legislature's own elaboration on the definition of "price of the collateral."  The official comments state that "the 'price' of collateral…includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations."  Va. Code Ann. § 8.9A-103(a)(2) cmt. 3.[14]  As discussed in greater detail below in Part I.B., this list does not contemplate the inclusion of negative equity.  More important for these purposes, the elaboration in the comments suggests that there should be no remaining ambiguity in the term "price of the collateral" requiring the review of other statutes.

Even if the court were to follow the reasoning of the court in <u>Graupner</u> and hold that the definition of the term "price" in Va. Code Ann. § 8.9A-103(a)(2) is ambiguous, there are no

---

[14] Virginia, New York, North Carolina, Ohio, and Georgia have all adopted the U.C.C. Official Comments for Article 9.  Comment 3 to each of the states' § 103 elaborates on the terms "purchase-money collateral," "purchase-money obligation," and "purchase-money security interest."

definitions in the Virginia Code that were enacted to interpret the definition of purchase-money

security interest, purchase-money collateral or purchase-money obligation to include negative

equity in the price of the new motor vehicle. The Virginia Code has nothing similar to Georgia's

MVSFA.  The court has identified no reference to "cash sales price," which is the definition used

in Graupner, anywhere in the Virginia Code.

Creditor GMAC suggests two statutes to which this court should look for guidance.

GMAC points first to Va. Code Ann. § 6.1-330.77 (1999), the Virginia retail installment sales

statute, as support to include the negative equity in the purchase-money security interest, but this

is not persuasive.  Under a new extension of credit this statute authorizes the imposition of

finance charges for the sales price, other incidental charges, and amounts paid to discharge a

security interest on traded-in property.  Va. Code Ann. § 6.1-330.77. The creditor points to no

evidence that supports its claim that this statute was passed in response to the rise of negative

equity financing in the automobile industry or that this was passed to interpret § 8.9A-103, where

the critical term is not merely "price", but "price of the collateral," and the subject matter is

security interests rather than allowable finance charges.  Instead, the creditor claims that because

the two code sections were passed in successive years,—§ 8.9A-103 was passed in 2000 and §

6.1-330.77 was passed in 1999, which counsel conceded at oral argument—they should be read

in pari materia.

GMAC is correct that Virginia law uniformly interprets statutes in pari materia.

However, in order to be construed together, they must "relate to the same subject matter."  Ipsen

v. Moxley, 49 Va. App. 555, 561, 642 S.E.2d 798, 801 (Va. App., 2007); See Lillard v. Fairfax

County Airport Auth., 208 Va. 8, 12–13, 155 S.E.2d 338, 341–42 (Va. 1967).  Given that the

retail installment sales statute makes no reference whatsoever to the terms purchase-money

13

security interest, purchase-money collateral, or purchase-money obligation, the statute's gloss on

sales prices is not sufficiently related to the Uniform Commercial Code's definition of purchase-

money obligations.  The retail installment sales statute appears to be in place to disclose to the

consumer the basis upon which allowable finance charges are calculated.  See Va. Code Ann. §

6.1-330.77.  GMAC argues that the Virginia retail installment sales statute is similar to the one

interpreted by the court in In re Graupner, 356 B.R. 907.  The Graupner court included negative

equity in the definition of purchase-money security interest based on substantial language

similarities between the Georgia MVSFA and the U.C.C.  See id. at 921.  Courts have also held

otherwise when faced with similar pairs of statutes.  See In re Acaya, 2007 WL 1492475 at *5;

In re Peaslee, 358 B.R. at 558.  This court does not find the requisite parallels between the

Virginia U.C.C. and its retail installment sales statute.[15]  Therefore, because § 6.1-330.77 was

not passed to interpret or clarify the definitions of purchase-money security interest, purchase-

money collateral or purchase-money obligation under § 8.9A-103, GMAC's argument is

unpersuasive.

While it could be argued that § 8.9A-103 incorporated the idea from the pre-existent §

6.1-330.77 that sales price and negative equity payoff amounts were part of the same financing

package, this argument likewise is without merit.  Had Virginia intended to incorporate the retail

installment sales act into the definition of "price" in § 8.9A-103, it could have cross-referenced

that section or otherwise made the connection explicit.  Having failed to do so, the court is left

with no choice but to find that § 6.1-330.77 does not alter the definition of "price of the

---

[15] As an example of another Virginia statute defining sales price in the motor vehicle context, Va. Code Ann. §58.1-2401, from the title on Taxation, defines "sales price" as the "total price paid for the *motor vehicle* . . . without any allowance or deduction for trade-ins or unpaid liens or encumbrances."  Id. (emphasis added).  This definition seems to contradict the expansive sales price definition suggested by GMAC's understanding of Va. Code Ann. 6.1-330.77.  Hence, the "same subject matter" requirement of the in pari materia doctrine is critical.

collateral" to allow negative equity to be included in the definition of purchase-money

obligations.

Second, GMAC asserts that the Federal Truth in Lending Act ("TILA"), 15 U.S.C. §

1601 et seq. (2003), includes negative equity in the "total sales price" of new vehicles.  If TILA

treats negative equity rolled-into a financing transaction as part of the total sales price when

interpreting vehicle financing issues, the creditors claim the Bankruptcy Code should do the

same.  This argument again is unpersuasive.  TILA was not enacted in order to define "purchase-

money obligation" or "price of the collateral" as used by Article 9 of the U.C.C.  See In re

Peaslee, 358 B.R. at 556.  Instead, it offers a convenient and clear disclosure mechanism by

which consumers are able to see and trace the negative equity rolled into their financing

transaction.  15 U.S.C. § 1601; See GMAC Brief, Case No. 06-33159, Docket # 29, p. 12 (stating

that TILA was implemented by Regulation Z "to include guidance on how purchase-money car

financers should treat negative equity and other recurrent transaction costs for *disclosure

purposes*") (citing to 64 F.R. 16614-01, 16617) (emphasis added); See also 12 C.F.R. § 226.1(b)

(TILA enacted to "promote the informed use of consumer credit by requiring *disclosures* about

its terms and cost.") (emphasis added).  TILA does not serve to define the relative priorities of

creditors, and should not alter the substantive rights of the parties transacting under state secured

transactions law.

Without a statutory definition enacted to interpret Article 9 of Virginia's U.C.C., and

finding TILA irrelevant, the court holds that the negative equity financing is not included in the

"price" of the motor vehicle collateral under Virginia law.

      B.     *Negative equity is not value given and used to enable the debtor to acquire rights
           in the collateral.*

The second part of the definition of purchase-money obligation is "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Va. Code Ann. § 8.9A-103(a)(2). Having found that negative equity is not included in "price," the court must consider whether the negative equity is value given to enable the acquisition of rights in the collateral. The Official Comments to the U.C.C. and the majority holdings quash that argument.

The courts in <u>Peaslee</u>, <u>Price</u>, and <u>Westfall</u> agree that Official Comment 3 to the revised U.C.C. § 9-103, which elaborates on both "price" and "value given to enable," did not contemplate the inclusion of negative equity in the definition of purchase-money security interest. Official Comment 3 states that "'price' of collateral or the 'value given to enable' includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations." U.C.C. § 9-103(a)(2) cmt. 3.

GMAC argues that the phrase "obligations for expenses incurred in connection with acquiring rights in the collateral" clearly includes rolled-in negative equity. Additionally, the creditors argue that the pay-off of negative equity is a "value given," and but for that value given to pay off the previous debt, the debtors could not have purchased the new motor vehicles.

Creditors' arguments are not compelling because the negative equity payoff obligation is not necessary to the transaction, it is not of the same type or magnitude as the other items listed in Comment 3, and there is an insufficiently close nexus between the negative equity payoff and acquiring a new vehicle.

Both <u>Peaslee</u> and <u>Price</u> held that the negative equity is not mandatory to purchase a motor vehicle, a component of the loan agreement, nor a value-enhancing add-on, and is therefore different from the list of expenses included in Comment 3.  <u>In re Price</u>, 363 B.R. at 741; <u>In re Peaslee</u>, 358 B.R. at 557.   <u>Westfall</u> echoed this sentiment when it explained that presence of the previous loans does not erect a legal bar to the purchase and financing of the new automobile, and it was merely a non-compelled accommodation to facilitate the purchase. <u>In re Westfall</u>, 2007 WL 981730 at *5.  These courts have found that the funds did not "enable" the debtors to purchase the vehicle because rolling negative equity into a new financing agreement is merely a convenient, but unnecessary, option.  <u>See id.</u>  <u>See also</u> <u>In re Price</u>, 363 B.R. at 741; <u>In re Peaslee</u>, 358 B.R. at 557.  Therefore, as <u>Peaslee</u> concluded, "there are simply two separate financial transactions memorialized on a single retail installment contract document for the convenience of some consumers and to allow the auto industry to sell more vehicles, which is good for both parties."  <u>In re Peaslee</u>, 358 B.R. at 558.

These arguments are persuasive.  This is not to say that a fee must be necessary or legally compelled in order to be considered part of the purchase-money transaction.  While taxes must be paid at the time of purchase, clearly some of the other fees listed in Comment 3 such as freight charges and storage are not legally compelled.[16]  Nonetheless, the fact that a negative equity payoff is not necessary or compelled cuts against its inclusion in the definition.  This is further reinforced by the fact that negative equity is of a different type and magnitude from the other listed items.

---

[16] <u>See</u>, <u>e.g.</u>, <u>In re Petrocci</u>, Case No. 06-34191, 19 (Bankr. N.D.N.Y. June 20, 2007).  The <u>Petrocci</u> court failed to distinguish between lack of compelled *payment* of charges and compelled *financing* of such charges.  Surely no debtor is compelled to finance the charges listed in Comment 3 and may choose to pay through other means instead. The compelled payments on items like taxes, however, seem to make up a significant amount of the total expense contemplated by the Comment.

Because negative equity may amount to as much as $10,000.00 or more, it is not equivalent to expenses contemplated by Comment 3.  See In re Peaslee, 358 B.R. at 557–58. Courts have described the items listed in Comment 3 as "incidental and directly related expense[s], such as taxes and license and registration fees."  Id.  See also In re Price, 363 B.R. at 741, (finding negative equity rolled into a financing agreement to be "significantly and qualitatively different from the … [listed] expenses that are typically part of an automobile sale.").  A review of a typical motor vehicle financing transaction reveals that most of the amounts corresponding to the "expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees," U.C.C. § 9-103(a)(2) cmt. 3, are insubstantial compared to the actual sales price of the vehicle, typically on the order of several hundred dollars at the most.  In the four cases consolidated here, the negative equity portion represented a significant percentage of the total amount financed: Pajot $7,960.82/$24,871.16 = 32%, Taylor $3,921.88/$20,146.18 = 19%, Price $6,089.30/$34,153.74 = 18%, Horne $3,721.17/$22,328.91 = 17%.  According to estimates, negative equity transactions occur in somewhere between 26 and 38 percent of new vehicle purchases, with recent unsupported statements by counsel for GMAC estimating it as high as 50 percent.[17]  It is clear that negative equity is a large component of an increasingly large number of financing transactions.  Where such a significant alleged component of purchase-money security interests is not included explicitly in the text of the U.C.C. or its official comments, the court

---

[17] See, e.g., FDIC Supervisory Insights, The Changing Landscape of Indirect Automobile Lending, June 23, 2005 ("J.D. Power and Associates estimates that approximately 38 percent of new car buyers have negative equity at trade-in, compared to 25 percent two years ago."); Brian J. O'Connor, At Trade-In, Many Car Buyers are Left with the Upside-Down Blues, Detroit News, June 12, 2006 ("Last month nearly 29 percent of U.S. car buyers found themselves 'upside down.'").

does not see a textual justification for placing it amongst a list in which it would be the

proverbial elephant in the room.[18] [19]

Although not emphasized by the parties, Comment 3 also provides a "close nexus"

limitation on purchase-money security interests: "The concept of 'purchase-money security

interest' requires a close nexus between the acquisition of collateral and the secured obligation.

Thus, a security interest does not qualify as a purchase-money security interest if a debtor

acquires property on unsecured credit and subsequently creates the security interest to secure the

purchase price." Va. Code Ann. § 8.9A-103 cmt. 3. GMAC states that the "close nexus"

requirement prevents creditors from rolling in financing from sources such as student loans or

credit card debts into a vehicle financing transaction. While this is undoubtedly true, this court

does not see the dividing line differentiating between vehicle negative equity and such

"unrelated" debt forms. In essence, at the moment the first vehicle is "bought" by the second

creditor as a trade-in, the secured debt held by the first creditor is satisfied by the value paid for

the car. The deficiency—the amount the first creditor's debt exceeds collateral value as

determined at the time of the trade—is the negative equity. This deficiency is unsecured just as

it would be if the first creditor had foreclosed. Therefore, the substance of the transaction,

though instantaneous, is that the second creditor is paying off the debtor's unsecured deficiency

---

[18] The Bankruptcy Court for the Northern District of New York found no substantial dissimilarity in its recent opinion, stating that it "can easily envision" the charges allowed by Comment 3 "in some circumstances comprising a significant amount relative to the value of the collateral itself." In re Petrocci, Case No. 06-34191, 18 (Bankr. N.D.N.Y. June 20, 2007). In this case, the sales contract in Horne has been stipulated to by the parties. The charges arguably contemplated by Comment 3 were as follows: Certificate of title fee: $10.00, Official fee paid to government agencies: $12.00, document fee: $95.00, service contract $755.00. This court disagrees with the court in In re Petrocci, and cannot envision how the other Comment 3 charges could reasonably reach the 17–32% level of the negative equity rolled into these cases.

[19] The court also notes a disturbing trend in these negative equity cases: enough animal imagery to fill a zoo. In addition to this court's elephant, one court refused to "gag at the gnat of a UCC ambiguity in order to swallow whole a camel-like contravention of BAPCPA." In re Petrocci, Case No. 06-34191, 28 (Bankr. N.D.N.Y. June 20, 2007). Another court opined that you cannot paint the stripes of a purchase-money security interest zebra onto a negative equity debt horse. In re Peaslee, 358 B.R. at 558 fn. 14.

debt on the first vehicle.  If the second creditor did not pay that debt off, the debtor would have the option of continuing to make payments to the first creditor, but that debt would be unsecured. The court sees no distinction between the substance of this transaction and paying off and rolling in any other unsecured debt that may be held by the debtor.  The lender could just as easily pay off the debtor's student loans and roll that amount into a secured claim on the second vehicle. The only possible nexus is that the purpose of the first debt was to acquire a vehicle, and the second debt is also to acquire a vehicle.  In sum, it is not clear that there is a close nexus between the negative equity payoff and the acquisition of the new vehicle.

Negative equity is not similar to or encompassed by any of the items specified in Comment 3.  It follows that negative equity is not "value given to enable the debtor to acquire rights" in the collateral.  If the drafters of the U.C.C. and legislatures enacting it wanted to include negative equity in the definition of purchase-money security interest, it could have been addressed much more explicitly in the statutory text or comments.  As a result, the court finds no basis for including negative equity in the definition of purchase-money security interest and holds that the portion of the transaction corresponding to the negative equity is not a purchase-money security interest.

II.      *Digression into gap insurance, extended warranties, rebate credits, and debt incurred during one year preceding bankruptcy filing.*

At this point in the opinion, the court must digress from the main current of the negative equity discussion to address three subsidiary issues raised only in passing, and un-emphasized in the hearings.  First, in the Horne case only, debtor asserts that the $755.00 extended warranty and gap insurance of $195.00 should not be considered part of the purchase-money security interest. Based on the authority presented by the parties and discussed below, the court holds that the

extended warranty is included in the purchase-money security interest while the gap insurance is

not. Second, in the Pajot case, BB&T asserts that the $3,000.00 rebate applied to the transaction

should reduce the negative equity rather than the purchase-money portion of the transaction. The

court holds that such rebates reduce the purchase price of the new vehicle and thus do not reduce

the negative equity rolled into the transaction. Third, in the Taylor case, CitiFinancial asserts

that even if the court finds no purchase-money security interest in the vehicle, the second clause

of the hanging paragraph applies because the vehicle was purchased within one year prior to the

bankruptcy filing. CitiFinancial's argument is not compelling based on recent precedent in

another bankruptcy court in this district, which this court chooses to follow.

     A.     *Gap insurance and extended warranties.*

     In cases not dealing with negative equity, several courts have addressed whether

extended warranties or service contracts are included as part of a purchase-money security

interest. GMAC cites to two of these cases, In re Murray, 346 B.R. 237, 240 (Bankr. M.D. Ga.

2006), and In re Johnson, 337 B.R. 269, 272–73 (Bankr. M.D.N.C. 2006), to support the

argument that extended warranties or service contracts are included as part of the purchase-

money security interest. Debtor cites only to In re Price, 363 B.R. 734, which as noted above

also deals with negative equity, to argue that the service contract should not be included as part

of the purchase-money security interest. Although cited by the debtor's brief, it appears that

Price addressed gap insurance rather than extended warranties or service contracts; hence the

court has not been presented with a conflict in authority on this issue. After reviewing each of

these cases, the court will follow the result advocated in Murray and Johnson, and holds that an

extended warranty or service contract is included as part of the purchase-money security interest.

The court believes that such charges, as required by Va. Code Ann. § 8.9A-103 and its

comments, have a nexus close enough to the acquisition of a new vehicle to allow their inclusion as a part of the purchase-money security interest.

The court has likewise not been presented with a conflict of authority regarding the treatment of gap insurance. Although GMAC argues that gap insurance is included in the purchase-money security interest, it presents no published authority to specifically support such a finding. See GMAC Brief, sec. IV.A. On the contrary, debtor cites to Price, which discussed gap insurance and did not include it as part of the purchase price. In re Price, 363 B.R. at 741 (citing In re White, 352 B.R. 633, 639 (Bankr. E.D. La. 2006)). In the face of no contrary authority, this court will follow Price and White and hold that the gap insurance is not a component of the purchase-money security interest.

In the briefing and argument of the cases consolidated before this court, neither extended warranties nor gap insurance were the focus of the parties' arguments, and the issues appear to only have been raised by Horne, although they are also present in Price. The primary issue for all cases was the treatment of negative equity. From the limited briefing and arguments presented by the parties, the court has decided to include extended warranties and exclude gap insurance from the purchase-money security interest. Where thoroughly addressed by future cases, this court may revisit the inclusion or exclusion of these components of a vehicle financing transaction in the purchase-money security interest.

B.    *Rebates.*

Several of the transactions at issue in these cases included manufacturer's rebates in the calculation of the total amount financed. BB&T is the lone creditor to explicitly request that its $3,000.00 rebate be credited to reduce the negative equity rolled into the transaction in Pajot, although it offers no legal support for its argument. Nissan also credited Ms. Price with a

$2,000.00 rebate in her transaction but did not raise this issue in its filings.  After reviewing the

retail installment sales contract and the buyer's order stipulated to by the parties in Pajot, the

court believes that the rebates are based not on the trade-in portion of the transaction, but instead

on the new car purchase.  The court believes the rebate is assigned as an incentive for the

purchase of the new car, rather than an incentive for trading in a used one.

The contract and buyer's order demonstrate that the amount credited to Mr. Pajot for his

trade-in was not increased by a rebate amount.  In the contract, five lines are set off under the

heading "Total Downpayment."  There is a clear delineation of the value allowed for the trade-

in, $7,000.00, and the cost of the negative equity payoff, $14,960.82, which combined yield the

net trade-in of negative $7,960.82.  The two final lines under this subsection are "+ cash" and "+

other: REBATE."  No cash was credited as a downpayment, but a value of $3,000.00 was

credited as a rebate in this subsection.  The court is convinced that the separate accounting for

the $3,000.00 rebate in this manner sets it apart from the trade-in transaction summarized by the

allowance and payoff amounts.  If the creditor wished to give the debtor a "rebate" for the trade-

in, it could have clearly been assigned to the trade-in by increasing the trade-in allowance

directly.  The creditor having not done so, the court is left with no evidence or argument

supporting a finding that the negative equity rolled into the transaction was reduced by the

rebate.  The court accordingly holds that, unless evidence indicates it was specifically applied to

increase the allowance on a trade-in, a rebate does not reduce the non-purchase-money negative

equity portion of a motor vehicle financing transaction.

C.    *Debt incurred during one year preceding bankruptcy filing.*

The final digression upon which the court must rule is CitiFinancial's argument regarding

the second clause of the hanging paragraph.  In addition to exempting a creditor's claim from

bifurcation if it is secured by a purchase-money security interest in a motor vehicle acquired for

personal use during the 910 days preceding the bankruptcy filing, the hanging paragraph also

exempts certain claims from bifurcation if the collateral is anything of value and the debt was

incurred during the one year preceding the bankruptcy filing.  11 U.S.C. § 1325(a)(*).  The

relevant language from the hanging paragraph is:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in
> that paragraph if that creditor has a purchase money security interest securing the
> debt that is the subject of the claim, the debt was incurred within the 910–day
> [sic] preceding the date of the filing of the petition, and the collateral for that debt
> consists of a motor vehicle (as defined in section 30102 of title 49) acquired for
> the personal use of the debtor, *or if collateral for that debt consists of any other
> thing of value, if the debt was incurred during the 1–year period preceding that
> filing.*

11 U.S.C. § 1325(a)(*) (emphasis added).  CitiFinancial argues in the Taylor case that its claim

cannot be separated into secured and unsecured portions because the vehicle was purchased

within one year prior to filing, hence the second clause of the hanging paragraph applies and

does not require the creditor to hold a purchase-money security interest.  CitiFinancial's

argument could also apply in Price and Horne, but it was not raised by the relevant creditors.

The case law proves this argument unsuccessful.

   In In re Ellegood, 362 B.R. 696 (Bankr. E.D. Va. 2007), the Bankruptcy Court for the

Eastern District of Virginia in Newport News decided "whether the 'hanging paragraph' requires

a creditor whose debt was incurred within one year of filing to possess a purchase-money

security interest in its collateral." Id. at 701.  Relying on In re Curtis, 345 B.R. 756 (Bankr. D.

Utah 2006), and In re Parish, 2006 WL 1679710 (Bankr. M.D. Fla. Mar. 10, 2006), Judge St.

John held that the creditor must have a purchase-money security interest for the hanging

paragraph to be applicable in either situation.  In re Ellegood, 362 B.R. at 704.

CitiFinancial's argument that the debt falls under the one-year clause is unsuccessful because the creditor does not have a purchase-money security interest securing the entire debt. The distinction between the 910-day period and the 1-year period is the type of collateral—motor vehicle purchased for personal use in the 910-day period, or any other thing of value in the 1-year period—and not the type of security interest.  Id.  Therefore, the court will follow Ellegood and hold that the second clause of the hanging paragraph does not apply in these cases.

III.     *Whether to apply the dual status or transformation rule to the non-purchase-money portion of the transaction.*

Because the court has concluded that the creditors' security interests are not entirely purchase-money, the court must determine the effect of such a classification on the applicability of the hanging paragraph.  It is clear that the hanging paragraph applies only to purchase-money security interests, but it is not clear whether a security interest that is *only partially* purchase-money retains *any* of its purchase-money character when it has been combined with a non-purchase-money security interest in one transaction.  The Uniform Commercial Code has traditionally used two approaches.  The "transformation rule" holds that a security interest that is part purchase-money and part non-purchase-money completely loses its purchase-money character and is entirely transformed into a non-purchase-money security interest.  See In re Price, 363 B.R. at 745.[20] The "dual status rule" allows the court to treat the portion that is purchase-money (essentially the purchase price) as purchase-money, whereas the non-purchase-money portion remains non-purchase-money and is treated accordingly.  See id.; See also In re Ionosphere Clubs, Inc., 123 B.R. 166, 171 (S.D.N.Y. 1991) (stating "the more modern trend is to recognize that only the security interest which secures the non-purchase price debt is not a PMSI,

but the interest which secures the purchase price debt retains its PMSI character" citing <u>Pristas v. Landaus of Plymouth, Inc.</u>, 742 F.2d 797, 800 (3d Cir. 1984)). The court finds the dual status rule compelling given the facts presented in these cases, notwithstanding the fact that the transformation rule has been chosen in many of the other negative equity cases this court relied on in Part I above.[21]  This decision is based primarily on an equitable analysis of BAPCPA's revisions.  Additionally, the facts in these cases provide straightforward negative equity valuations, avoiding the "evidentiary nightmare" that has spurred other courts to adopt the transformation rule.[22]  At least one other bankruptcy court has applied the dual status rule to a negative equity case where such evidence was clearly articulated.  <u>See</u> <u>In re Acaya</u>, 2007 WL 1492475 (Bankr. N.D. Cal. 2007).[23]  Although the court follows the dual status rule on these facts, it reserves the discretion to apply the transformation rule in cases where the negative equity amount has been obfuscated by creditors' methods of accounting for vehicle trade-ins.[24]

A.    *Virginia Code § 8.9A-103 gives the court discretion to apply either rule in consumer goods transactions.*

Virginia Code § 8.9A-103 expressly approves the dual status rule for non-consumer-goods transactions.  <u>See</u> Va. Code Ann. § 8.9A-103 cmt. 7.  Subsections (e), (f), and (g) detail the operation of the dual status rule.  Subsection (f) makes it clear that when purchase-money collateral secures an obligation that is not a purchase-money obligation, "a purchase-money

---

[20] The Fourth Circuit has applied the transformation rule to a case dealing with 11 U.S.C. § 522, <u>Dominion Bank of the Cumberlands, N.A. v. Nuckolls</u>, 780 F.2d 413 (4th Cir. 1985), but the court does not find that dispositive in this context.  Additionally, the revisions to Article 9 since that time have significantly altered the statutory landscape.
[21] <u>In re Peaslee</u>, <u>In re Price</u>, and <u>In re Westfall</u>, have all applied the transformation rule.
[22] For an example of an "evidentiary nightmare" regarding veiled negative equity in an allegedly over-valued trade-in for the purchase of an over-priced used car, <u>see</u> <u>In re Jackson</u>, 358 B.R. 560 (Bankr. W.D.N.Y. 2007).
[23] The court in <u>In re Vega</u> applied the dual status rule under slightly different circumstances.  <u>See</u> <u>In re Vega</u>, 344 B.R. 616, 622 fn. 29 (Bankr. D. Kan. 2006).
[24] The court notes that even in these cases, unraveling the relationship between negative equity payoffs, trade-in allowances, rebates, service contracts, gap insurance, and payment allocation has been a tedious task, leading the court to the brink of abandoning the dual status rule in favor of the transformation rule.  The court hopes that

security interest does not lose its status as such." Va. Code Ann. § 8.9A-103(f). Rather, "a secured party claiming a purchase-money security interest has the burden of establishing *the extent to which* the security interest is a purchase-money security interest." Va. Code Ann. § 8.9A-103(g) (emphasis added). As explained in Official Comment 7 to this section, this clarifies that "a security interest may be a purchase-money security interest to some extent, and a non-purchase-money security interest to some extent." Id. at cmt. 7. Subsection (e) articulates the appropriate allocation of payments to the purchase-money and non-purchase-money portions of the security interest. Absent agreement by the parties to the contrary, the default rule is that payments are allocated first to the unsecured portion of the transaction, then to purchase-money security interests. Va. Code Ann. § 8.9A-103(e).

The transformation rule, by contrast, does not contemplate any division into purchase-money and non-purchase-money portions, nor does it require any form of payment allocation. Instead, the rule operates to completely destroy the purchase-money status of any transaction that would purport to mix both purchase-money security interests and other types of security interests. See In re Price, 363 B.R. at 745. This approach is laudable for its simplicity, but perhaps is too overbroad.

Although the dual status rule is approved and implemented for non-consumer-goods transactions, Virginia Code § 8.9A-103(h) provides that for consumer-goods transactions the proper rules may be determined by the court.[25] The vehicles purchased for personal debtor use in these consolidated cases constitute consumer goods; therefore, the court may determine the

---

applying the dual status rule will encourage clear treatment of the components of a vehicle financing transaction, and stimulate stipulations as to many of these values in future negative equity cases.

[25] In some jurisdictions the choice between dual status and transformation rules has been constrained either by the state legislature or by precedent. See In re Vega, 344 B.R. at 622 fn. 29 (finding that the legislature mandated the

proper rules.  While the court is free to use other established approaches (i.e. the transformation rule) for consumer goods cases, it may not draw any inference from limitation of the rule to non-consumer-goods cases.  See Va. Code Ann. § 8.9A-103(h) cmt. 8.  The parties have not identified Virginia case authority which would require the court to follow either rule for a consumer goods transaction such as the one in this case.  Therefore, the court will use its discretion to determine the appropriate rule for a transaction combining rolled in non-purchase-money negative equity with a purchase-money security interest in the remaining amount financed.

        B.    *Equitable analysis of the dual status rule in the context of BAPCPA.*

Prior to BAPCPA, vehicle financers could be harmed by a debtor who acquired a vehicle in the months leading up to bankruptcy, then filed bankruptcy and crammed the creditor's claim down to the collateral value on the date of filing.  Due to the rapid depreciation of motor vehicles the moment they leave the dealer's lot, debtors could often reap a benefit by cramming down the debt, only paying a secured claim equal to the depreciated value of the car.[26]  Home mortgages, while a traditionally appreciating asset, are protected from bifurcation and cramdown by 11 U.S.C. § 1322(b).  In enacting the hanging paragraph, Congress fixed this disparity to ensure that debtors could not load up on vehicle-secured debt pre-petition only to cram it down to the collateral value in bankruptcy.  See In re Payne, 347 B.R. 278, 281 (Bankr. S.D. Ohio 2006).

If this court chose to apply the transformation rule where negative equity is rolled into the transaction, this would re-enable debtors to cram down the secured claim to the collateral value,

---

dual status rule in both commercial and consumer contexts); In re Graupner, 356 B.R. at 914, 916 (finding the court believed itself constrained to follow Eleventh Circuit precedent applying the transformation rule.)

[26] For example, if a debtor bought a brand-new car six months prior to bankruptcy for $20,000.00, its value could have depreciated to $15,000.00 or so by the time of filing, whereas the total payments to principal may have totaled

meaning the hanging paragraph would be completely ineffective as to almost half of the vehicle

financing transactions it was designed to address.  Applying the more policy-sensitive dual status

rule, however, preserves the intent of the hanging paragraph *to the extent* that the collateral is

purchase-money.  See Borg-Warner Acceptance Corp. v. Tascosa Nat'l Bank, 784 S.W. 2d 129,

135 (Tex. 1990); See, e.g., In re Ionosphere Clubs, 123 B.R. 166, 172 (S.D.N.Y. 1991) (finding

that the "to the extent" language of the U.C.C. supported the dual status rule).  Thus, the dual

status rule preserves the purpose of the hanging paragraph for vehicle lending transactions—

protecting the creditor from having its secured claim reduced by rapid depreciation of

collateral—whereas the transformation rule would completely undermine the hanging paragraph

whenever negative equity was rolled in.

     If this court had instead decided that negative equity constituted part of the purchase-

money security interest, the benefit of the hanging paragraph's anti-bifurcation provision would

be over-extensive.  If vehicle financers were able to secure additional amounts of negative equity

rolled into a transaction and protect it from bifurcation and cram-down, this would improve such

a lender's position greatly, arguably above the code's treatment of mortgage lenders.  The court

does not believe Congress intended vehicle financers to reap such a windfall. Although not the

basis for its decision, this supports the court's conclusion that negative equity is not included in

the scope of the hanging paragraph.

     The court therefore views the adoption of the dual status rule as a compromise result, in

contrast to the two extremes of either rendering the hanging paragraph almost meaningless

through the transformation rule, or equipping the hanging paragraph with power beyond its intent

by finding negative equity included in the definition of purchase-money security interests.  The

---

only $1,000.00.  Cramdown would enable the debtor to pay only the $15,000.00 amount rather than the entire debt

following subsection examines the numerical nature of that compromise.

> C.    *Generalized effect of rule choice and payment allocation on negative equity transactions.*

Having decided to apply the dual status rule, the court finds it illustrative to examine the effect that the choice of rule would have on a generalized negative equity transaction.  Because the parties have not chosen a payment allocation rule, the court will examine the appropriate allocation of payments under the dual status rule to determine the value of the purchase-money and the non-purchase-money portions of the debt.[27]  Using a hypothetical, we will consider the debtor to have initially financed $25,000.00, $5,000.00 of which was negative equity rolled in from a trade-in.  As of filing, the vehicle collateral value is $15,000.00, and the debt remaining to be paid off is the creditor's $22,500.00 claim.

If this court applied the transformation rule to the transaction in question, that would mean that the creditor's claim is not purchase-money at all.  Hence, the hanging paragraph would not apply and the debtor could bifurcate the claim under 11 U.S.C. § 506, splitting it into a secured portion (the collateral value) and an unsecured portion (the difference between the total claim and collateral value).  In our hypothetical, this results in a $15,000.00 secured claim and a $7,500.00 unsecured claim.  This same result would have occurred under bifurcation of a secured claim prior to BAPCPA.

If, however, this court applied the dual status rule to the transaction, this would mean that the creditor's claim is purchase-money to the extent that the claim *does not include* non-

---

owed which would be $19,000.00.  The $4,000.00 difference would be paid as an unsecured claim.

[27] This court charts new territory by evaluating dual status payment allocation rules in the negative equity context. Several courts applying the transformation rule have discussed payment allocation rules and avoided the dual status rule as a result.  See, e.g., In re Price, 363 B.R. at 746.  The courts applying the dual status rule have either not discussed, see In re Vega, 344 B.R. at 622, or not yet chosen a method of allocating payments.  See In re Acaya, 2007 WL 1492475 at *6.

purchase-money negative equity.  As a result, the hanging paragraph would not apply to the

negative equity portion of the claim, and that portion could be bifurcated into a secured and

unsecured portion.  The remaining purchase-money portion, however, falls under the hanging

paragraph and cannot be bifurcated, making it entirely secured.  The hypothetical creditor would

have a $5,000.00 unsecured claim based on the non-purchase-money portion, and the remainder

of the claim, $17,500.00, would be considered secured.[28]

At this point, however, it is necessary to clarify that there are several different theoretical

ways to apply the dual status rule.  The above illustration assumed that all payments from the

time of sale to filing bankruptcy were applied to reduce the purchase-money portion of the claim

first, leaving untouched the non-purchase-money portion.  At the date of purchase, the creditor

had a $20,000.00 purchase-money security interest, and a $5,000.00 non-purchase-money

security interest based on the negative equity.  The $2,500.00 in payments between purchase and

filing were all allocated to paying down the purchase-money portion, leaving a $17,500.00

purchase-money security interest at the time of filing.  While this appears to be the payment

allocation advocated by Virginia Code § 8.9A-103(e) for non-consumer-goods transactions,[29]

other results are worth examining because the court has discretion in allocating payments for

consumer-goods transactions.

The second way to apply payments between sale and filing would be to apply them first

to the non-purchase-money portion of the claim.  In the illustration, this would mean the net

---

[28] The dual status rule thus provides the creditor with a $2,500.00 benefit over pre-BAPCPA cramdown practice and
the transformation rule.  If the court ruled differently in Part I and considered negative equity part of the purchase-
money security interest, the creditor would reap a $7,500.00 windfall with the full $22,500.00 treated as secured.

[29] Virginia Code § 8.9A-103(e) allocates payments for a mixed purchase-money and non-purchase-money
transaction first to unsecured debts, then to debts secured by purchase-money security interests.  Because the
creditors in these cases hold a security interest in the collateral, though not entirely a *purchase-money* security
interest, there is no unsecured debt for U.C.C. purposes.  Only after applying the hanging paragraph and bifurcating
the claim under § 506 of the Bankruptcy Code would there be an unsecured portion upon which to apply payments.

$2,500.00 in payments reduces the non-purchase-money portion from $5,000.00 to $2,500.00. The purchase-money portion would remain at $20,000.00. Thus, upon applying the hanging paragraph, the creditor would hold a $20,000.00 secured claim and a $2,500.00 unsecured claim.

The final way to apply payments between sale and filing is to pro-rate the pre-bankruptcy payments to both the purchase-money portion and the non-purchase-money portion, reducing each proportionally. This is the method advocated by GMAC in the case at hand if the court rules that the negative equity is not included in the purchase-money security interest. In the hypothetical case, the initial ratio of purchase-money to non-purchase-money is $20,000.00 to $25,000.00, or 80%. The $2,500.00 in payments applied would reduce the purchase-money portion by 80% x $2,500.00, or $2,000.00. The non-purchase-money portion would be reduced by the remaining $500.00 in payments. Thus, after the debtor applies the hanging paragraph and bifurcates the claim, the creditor has a secured claim of $20,000.00 - $2,000.00 = $18,000.00 and the unsecured claim is $5,000.00 - $500 = $4,500.00.

The only problem with the final method is the difficulty in computing the payments received and applying them in the appropriate proportion to arrive at this result. The sales contract discloses the negative equity rolled into the transaction, giving a starting point for the ratio of non-purchase-money to purchase-money. The total amount of payments made, however, may be more difficult to calculate given the accumulation of interest and penalties over the period immediately preceding bankruptcy. As a rough approximation, however, it could also be assumed that interest and penalties accumulate proportionally as well. Therefore, the difference between the initial financed amount and the amount of debt remaining would be considered the "net payments" made preceding bankruptcy. The net payments would then be applied proportionally and appropriate secured and unsecured portions of the claim could be calculated.

Table 1 summarizes the numbers discussed above.  Table 2 illustrates the difference if a higher amount, $7,500.00, of payments was received during the pre-bankruptcy period, reducing the debt remaining to $17,500.00.

Table 1

| Rule (with $2,500.00 paid prior to bankruptcy) | Secured Claim | Unsecured Claim |
| --- | --- | --- |
| Transformation Rule | $15,000.00 | $7,500.00 |
| Dual Status Rule, Payments to PM 1st | $17,500.00 | $5,000.00 |
| Dual Status Rule, Payments to non-PM 1st | $20,000.00 | $2,500.00 |
| Dual Status Rule, Payments proportional | $18,000.00 | $4,500.00 |

Table 2

| Rule (with $7,500.00 paid prior to bankruptcy) | Secured Claim | Unsecured Claim |
| --- | --- | --- |
| Transformation Rule | $15,000.00 | $2,500.00 |
| Dual Status Rule, Payments to PM 1st | $12,500.00* $15,000.00 | $5,000.00* $2,500.00 |
| Dual Status Rule, Payments to non-PM 1st | $17,500.00 | $0.00 |
| Dual Status Rule, Payments proportional | $14,000.00* $15,000.00 | $3,500.00* $2,500.00 |

---

[*] The court must note the significance of the struck-through values marked by an asterisk in Table 2. The determination of a secured and an unsecured claim is accomplished by a two-step process. First, determine the purchase-money portion and the non-purchase-money portion of the transaction. The purchase-money portion will always be entirely secured by operation of the hanging paragraph, even if the collateral value is less than the purchase-money debt. Second, apply § 506 and bifurcate the non-purchase-money portion corresponding to the negative equity. In many situations the collateral value is less than the purchase-money debt and there is no collateral value "left over"; when bifurcated, the entire non-purchase-money portion is unsecured. If, however, the collateral value is greater than the purchase-money portion of the claim, as is the case for the struck-through scenarios above, there is now collateral "left over" to secure some of the non-purchase-money portion when that portion is bifurcated in the second step. This means that the total secured claim consists of the purchase-money portion, plus any secured amount resulting from bifurcation of the non-purchase-money portion. The net effect of the two-step process is that § 506 effectively sets the collateral value at filing as a floor below which the secured claim cannot be decreased. This table illustrates that where pre-bankruptcy payments are sufficiently large, the different rules and allocation methodologies may yield the same result. The payments in these cases did not reach this threshold, however, so choice of rule does make a difference, as in Table 1 above.

The court concludes that the most appropriate and realistic default method of allocating payments under the dual status rule is to allocate them proportionally, according to the ratio of the non-purchase-money portion to the total amount financed.

D.      *Application of the dual status rule to the facts in these cases.*

Applying the dual status rule yields the following secured and unsecured claims which must be accounted for under each debtor's plan.

Pajot:  Debtor financed a total of $24,871.16.  The negative equity rolled into the transaction was $7,960.82, representing 32.01% of the transaction total.  The creditor filed a secured claim in the amount of $21,137.60, indicating net payments prior to bankruptcy of $3,733.56.  The payments are allocated proportionally to reduce the negative equity portion in the amount of $1,195.05 and the purchase-money portion in the amount of $2,538.51.  Accordingly, the allowed unsecured claim is $7,960.82 - $1,195.05 = $6,765.77.  The allowed secured claim is $21,137.60 - $6,765.77 = $14,371.83.

Taylor:  Debtor financed a total of $20,146.18.  The negative equity rolled into the transaction was $3,921.88, representing 19.47% of the transaction total.  The creditor filed a secured claim in the amount of $20,732.53, indicating no net payments prior to bankruptcy.  Accordingly, the allowed unsecured claim is $3,921.88.  The allowed secured claim is $20,732.53 - $3,921.88 = $16,810.65.

Price:  Debtor financed a total of $34,153.74.  The negative equity rolled into the transaction was $6,089.30, which added to the non-purchase-money gap insurance of $295.00, totals $6,384.30, representing 18.69% of the transaction total.[30]  The creditor filed a secured

---

[30] The other components of the financing are all included in the purchase-money portion, including $995.00 for a service contract.  The percentage differs from that in Part I.B. because this percentage accounts for gap insurance.

claim in the amount of $32,745.48, indicating net payments prior to bankruptcy of $1,408.26.

The payments are allocated proportionally to reduce the negative equity portion in the amount of

$263.24 and the purchase-money portion in the amount of $1,145.02.  Accordingly, the allowed

unsecured claim is $6,384.30 - $263.24 = $6,121.06.  The allowed secured claim is $32,745.48 -

$6,121.06 = $26,624.42.

Horne:  Debtor financed a total of $22,328.91.  The negative equity rolled into the

transaction was $3,721.17, which added to the non-purchase-money gap insurance of $195.00,

totals $3,916.17, representing 17.54% of the transaction total.[31]  The creditor filed a secured

claim in the amount of $21,332.71, indicating net payments prior to bankruptcy of $996.20.  The

payments are allocated proportionally to reduce the negative equity portion in the amount of

$174.72 and the purchase-money portion in the amount of $821.48.  Accordingly, the allowed

unsecured claim is $3,916.17 - $174.72 = $3,741.45.  The allowed secured claim is $21,332.71 -

$3,741.45 = $17,591.26.

Although this court chooses to apply the dual status rule, it is not without reservation.

Peaslee, Price, and Westfall all chose to apply the transformation rule rather than the dual status

rule to negative equity transactions.  Only In re Acaya, 2007 WL 1492475, applies the dual

status rule under similar circumstances.  The rationale for each of these decisions was the burden

of administering the dual status rule compared to the ease of applying the hard-edged

transformation rule.  Peaslee, Price, and Westfall all found the burden significant, while stringent

disclosure rules in California made the dual status rule easier to apply in Acaya.  Based on the

record developed by the parties in this case, as in Acaya, there does not appear to be an excessive

burden associated with employing the dual status rule.  Were negative equity amounts less clear,

the court could review the Truth In Lending Act disclosure statements and make findings on the

negative equity amount.  With the facts presented in these cases, the court can determine the net

amount of payments made in each case and apply those proportionally to the non-purchase-

money and the purchase-money portions of the transaction.  Therefore, the court can clearly

determine the portion of the debt that can be bifurcated and the portion that is protected by the

hanging paragraph.

The debtors in these cases urge the court to adopt the transformation rule, partially out of

a fear that application of the dual status rule would be too difficult to apply in light of the

"mystery" of the actual vehicle purchase price and trade-in value when conducting a trade-in

transaction.  Such fear is not without merit.  This court agrees that vehicle trade-in transactions

are shrouded in a confusing array of rebates, discounts, credits, and negative equity pay-offs.

See, e.g., In re Jackson, 358 B.R. 560 (Bankr. W.D.N.Y. 2007). Nonetheless, the facts presented

by the parties in these cases appear to give fair valuations to the dollar amount that matters—the

negative equity.

Debtors may also fear that the court's ruling will lead to creditors playing "bait-and-

switch" games in order to reduce the non-purchase-money negative equity portion while

incorporating new fees or otherwise attempting to shift a portion of the transaction into the

category of a purchase-money-security interest.  As stated above, because the choice between

dual status and transformation rules is left to the court's discretion by Virginia Code § 8.9A-

103(h), the court may determine on a case by case basis that certain transaction details are not

clearly articulated enough to apply the dual status rule.  Therefore, if a negative equity

transaction is structured such as to obfuscate transaction details or otherwise abuse the dual

---

[31] The other components of the financing are all included in the purchase-money portion, including a $755.00

status rule, this court will not hesitate to discretionarily apply the more stringent transformation rule allowing bifurcation of the entire transaction.

IV.    *Policy implications of the court's decision.*

The court finds it worthwhile to conclude its opinion with a brief policy discussion. The court believes the policy implications of this type of financing transaction support its compromise decision to apply the dual status rule.

The bankruptcy laws must necessarily balance between making capital available to individuals and providing relief to those same individuals from improvident use of debt. The payoff of negative equity on an old vehicle often gives a desirable financial push for debtors to acquire a new vehicle. Many debtors likely could not afford to purchase a new vehicle while paying off the debt on both the new vehicle and an old one. Thus, it is important for debtors to have negative equity payoffs available in the menu of financing opportunities to purchase a new car. This court's decision enforcing the dual status rule will not prevent negative equity payoffs because such financing already occurred with relatively high frequency prior to BAPCPA.

The opposite decision, including negative equity payoffs as a portion of a non-bifurcatable secured claim, may actually provide too great an incentive for creditors making such capital available to debtors.[32] While an increase in capital availability could arguably be even better for debtors, this court is hesitant to make such a proclamation because many individuals facing a negative equity "deal" to buy a new car are not facing a critical capital crisis with respect to transportation. This is not to say that their financial outlook is positive, but these

---

service contract. The percentage differs from that in Part I.B. because this percentage accounts for gap insurance.

[32] The court in In re Petrocci, Case No. 06-34191, 28 (Bankr. N.D.N.Y. June 20, 2007), insightfully points out that this incentive is counter-balanced when the debtor can surrender the vehicle in full satisfaction of the lender's claim in accordance with 11 U.S.C. § 1325(a)(5)(C). Thus, the risk of losing large amounts of secured negative equity through surrender tempers the incentive to roll in ever-increasing amounts. This court has not addressed the

debtors *have a functioning car* worthy of a trade-in.  None of the debtors in these four

consolidated cases traded in a vehicle more than four years old, nor did they acquire a second

vehicle more than one year old.  A new car does not appear to be a critical *need* for many

individuals in this situation.

These seemingly unrequired purchases illustrate why so many American consumers have

financial problems.  No small part of the problem is the excessive availability of capital that

creates opportunities for imprudent borrowing.  If negative equity were to be included as a

purchase-money security interest, lenders would be rewarded for rolling in as much negative

equity as possible.[33]  It would enable the creation of a security interest out of what otherwise

would have been unsecured out of bankruptcy, creating a significant predatory lending problem

whereby the creditor could actually receive more out of a bankrupt debtor than it would

otherwise.  As a result, those debtors on the brink of bankruptcy will suddenly find themselves

inundated with the opportunity to do exactly what they should not be doing—acquiring another

large unnecessary item on credit.  Accordingly, the court is not uncomfortable with limiting the

availability of negative equity financing by finding that negative equity is not protected from

bifurcation by the hanging paragraph.

If this court instead enforced the transformation rule, it would be undoing much of

Congress' effort to protect vehicle financers from alleged credit-loading prior to bankruptcy.

This court has no doubt that some debtors do intend to abuse the system by loading up on debt

only to plan on cramming it down to actual collateral value, yet somehow Congress failed to

---

surrender option in the context of the hanging paragraph, and is reluctant to allay its concerns by relying on the
counter-balancing effect of a currently unsettled issue.

[33] The court must note that GMAC's brief implies that the vehicle purchaser is often the one to request that the
dealer pay off their negative equity.  The court is dubious that this payoff idea originated with new vehicle
purchasers, especially given the extensive evidence provided by GMAC regarding the motor vehicle lending

respond to the lending side of the transaction in reducing pre-bankruptcy credit-loading.[34]  The

court believes that without some additional protection for vehicle financers from the rapid

depreciation in their collateral, the availability of capital could dry up for some genuinely needy

debtors.  As such, the court is hesitant to apply the transformation rule, which would undo the

effect of the hanging paragraph for 38-50% of the transactions to which it would apply.

In sum, the compromise approach represented by the dual status rule strikes an

appropriate balance of preserving capital availability for debtors on the brink of bankruptcy,

without providing too great an incentive for creditors to finance excessive negative equity

amounts.

V.    *Conclusion.*

For the above reasons, the objections to confirmation filed by each creditor are sustained

in part, and the plan in each case must be modified to allow the secured and unsecured claims

listed in Part III.D. above.  A separate order will issue in each case.


SIGNED:



/s/ Douglas O. Tice Jr.
DOUGLAS O. TICE JR.
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

industry's efforts to have this transaction type approved by both federal and state disclosure and financing laws.  The
court is doubtful that the roll-in of negative equity was a preferred cause of consumer advocates.
[34] See, e.g., John A. E. Pottow, Private Liability for Reckless Consumer Lending, 2007 U. Ill. L.R. 405, 414–415
(2007).

Copy to:

John R. Bollinger, Esquire
Boleman Law Firm, P.C.
P.O. Box 11588
Richmond, Virginia 23230-1588
*Counsel for Chapter 13 Debtors*

Robert E. Hyman, Esquire
P.O. Box 1780
Richmond, Virginia 23218-1780
*Chapter 13 Trustee*

Deborah S. Kirkpatrick, Esquire
P.O. Box 10275
Virginia Beach, Virginia 23450-0275
*Counsel for Branch Banking & Trust Company*

Sara A. John, Esquire
M. Richard Epps, P.C.
605 Lynnhaven Parkway
Virginia Beach, Virginia 23452
*Counsel for CitiFinancial Auto Corporation*

John P. Van Beek, Esquire
Young, Goldman & Van Beek, P.C.
P.O. Box 1946
Alexandria, Virginia 22313-1946
*Counsel for Nissan Motor Acceptance Corporation*

Carl A. Eason, Esquire
Steven L. Brown, Esquire
Wolcott Rivers Gates
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462-1100
*Counsel for GMAC*

Barkley Clark, Esquire
Marc E. Albert, Esquire
Stinson Morrison Hecker LLP
1150 18th Street, NW
Suite 800
Washington, D.C.  20036
*Co-Counsel for GMAC*